IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 13 |
| Robert L. Higgins, | : | |
|     Debtor. | : | Bankruptcy No. 16-13543-MDC |
| | | |
| William Workman, | : | |
|     Plaintiff, | : | |
| v. | : | Adversary No. 16-00352-MDC |
| Robert L. Higgins, | : | |
|     Defendant. | : | |

# **MEMORANDUM**

BY: MAGDELINE D. COLEMAN, CHIEF UNITED STATES BANKRUPTCY JUDGE

## I. INTRODUCTION

Before the Court for consideration are two separate matters in the bankruptcy case of Robert L. Higgins (the "Debtor" or the "Defendant"). First, is the Debtor's objection to the proof of claim (the "Claim Objection") filed by William Workman ("Workman"). Second, is the adversary action filed by Workman, seeking a determination that the Debtor's debt to Workman is nondischargeable (the "Nondischargeability Action") pursuant to various sections of the Bankruptcy Code, 11 U.S.C. §101 *et. seq.* (the "Bankruptcy Code").

For the reasons set forth below, the Court finds that Workman does not have a valid claim against the Debtor, and therefore will sustain the Debtor's Claim Objection. Because Workman does not hold a claim against the Debtor, there is no claim that can be ruled

nondischargeable, and the Court will enter judgment in favor of the Debtor in the Nondischargeability Action.

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary bankruptcy petition under chapter 13 of the Bankruptcy Code on May 18, 2016.[1] In his Schedule E/F, identifying creditors who have unsecured claims, the Debtor listed Workman as having a claim in an unknown amount based on a "Complaint filed in the Court of Chancery for the State of Delaware."[2] The Debtor did not list the claim as contingent, unliquidated, or disputed in his original Schedule E/F, but subsequently filed an amended Schedule E/F listing the claim as unliquidated and disputed.[3]

On June 6, 2016, Workman filed a proof of claim against the Debtor (the "Workman Proof of Claim"),[4] asserting an unsecured claim in the amount of $750,000.00 based on "fraud." On October 10, 2016, Workman followed with the initiation of the Nondischargeability Action[5] against the Debtor to seek a determination that the Debtor's alleged debt to Workman is nondischargable pursuant to §§523(a)(2), (a)(4), (a)(6), and (a)(19) of the Bankruptcy Code.[6] On November 10, 2016, the Debtor filed an Answer in the Nondischargeability Action, denying that Workman is entitled to a finding of nondischargeability and asserting various affirmative defenses.[7]

---

[1] Bankr. Docket No. 1.
[2] Bankr. Docket No. 16.
[3] Bankr. Docket No. 27.
[4] Claim No. 7-1.
[5] Adv. Pro. No. 16-00352.
[6] Adv. Pro. Docket No. 1.
[7] Adv. Pro. Docket No. 4.

2

On November 5, 2017, the Debtor filed the Claim Objection, asserting that Workman had not attached any supporting documentation and provided "no substantiation whatsoever for the amount claimed and makes the bald allegation of 'fraud.'"[8] On November 20, 2017, Workman responded to the Claim Objection (the "Response"), asserting that his claim was based upon "the Debtor's fraudulent conduct in selling securities in an entity that the Debtor owned and controlled, Certified Assets Management, Inc.," and attaching various documents in support of his claim.[9]

On December 14, 2017, the Court held a hearing on the Claim Objection and Response and on January 25, 2018 entered an Order directing that they be consolidated with the Nondischargeability Action for trial purposes because they required the determination of similar issues. On May 14, 2018, the Court held a trial in the Nondischargeability Action and the Claim Objection, at which the Parties each testified and various exhibits were admitted into evidence. At the Court's direction, the Parties each submitted post-trial briefs on August 15, 2018.[10]

### III. RELEVANT FACTUAL BACKGROUND[11]

#### A. Workman's Investment in CAMI

The Debtor is the president, sole shareholder and sole director of Certified Assets Management, Inc. ("CAMI"), a Delaware corporation.[12] CAMI was formed in 2001 and was

---

[8] Bankr. Docket No. 92.

[9] Bankr. Docket No. 99.

[10] Adv. Pro. Docket Nos. 33, 34.

[11] The facts cited herein are taken from the Complaint, the Answer, the Response, the uncontested facts in the Parties' Joint Pre-Trial Statement ("Joint Pre-Trial Statement") (Bankr. Docket No. 21), the Parties' testimony at trial, and the exhibits introduced into evidence at the trial. While there was significant testimony and other evidence at trial on other facts the Parties deemed relevant to their claims and defenses, the Court has cited only to those facts necessary to provide a general overview of the relationship between the Parties and the current dispute. Because the Court views the issue of whether Workman has a claim against the Debtor, as opposed to a claim against his wholly-owned entity, as dispositive of the resolution of the other issues before the Court, it is unnecessary to provide a full recitation of all of the facts developed at trial.

[12] Trial Transcript, 111:22 to 113:11.

engaged in the buying and selling of numismatic (collectible) coins.[13] The Debtor is also the sole member of First State Depository, LLC ("FSD"), a Delaware limited liability company.[14] FSD was formed in 2006 to provide secure, vault-like storage for rare coins and precious metals.[15]

Workman is a resident of Long Beach, California.[16] Workman was introduced to the Debtor and CAMI by a coin dealer at a Long Beach, California coin show in 2004.[17] Workman testified that after talking to the Debtor at the coin show and "getting his take on the details," Workman decided to invest in CAMI.[18] Workman subsequently invested in CAMI through the purchase of three separate Secured Participations, each in the amount of $250,000.00 and together totaling $750,000.00.[19] Workman's first investment occurred in August of 2005, his second in March of 2006, and his third in June of 2008.[20]

Each of the Secured Participations was offered to Workman pursuant to the terms of an Offering Circular and Subscription Agreement.[21] The Offering Circular provided that the Secured Participations represented a one-year obligation secured by numismatic coins physically held by CAMI or its designated depositories or agents.[22] In exchange for each $250,000.00 investment, Workman was entitled to receive 12 monthly interest payments at the rate of 12%

---

[13] Trial Transcript 111:12 to 13; Defendant's Exhibit 5, Offering Circular at p. 6.
[14] Complaint, at ¶5; Plaintiff's Exhibit 5 at p. 2.
[15] Trial Transcript, 120:19 to 121:4; 129:21 to 130:1.
[16] Trial Transcript, 83:10 to 83:13.
[17] Trial Transcript, 83:14 to 83:23.
[18] Trial Transcript, 85:11 to 85:21.
[19] Trial Transcript, 45:17 to 46:13.
[20] *Id.*
[21] Trial Transcript, 56:11 to 56:16; Debtor's Exhibit 5.
[22] Defendant's Exhibit 5, Offering Circular at p. 4.

simple interest per annum, or $2,500.00 each, and the return of his investment at the end of one year unless renewed for another one-year period.[23] Workman exercised his option to extend each of the Secured Participations beyond their one-year term.[24] The Offering Circular provided that the Secured Participations were direct obligations of CAMI and that "Each Secured Participation offered hereby represents an obligation of the Company secured by all collateral pledged to the Company ratable with all other Secured Participations. Holders have full recourse to the Company for payment of the principal of and interest on the Secured Participations."[25]

### B. Workman's Actions to Regain His Investment in CAMI

Workman testified that after he made his initial $250,000.00 investment in CAMI in 2005, he received his monthly $2,500.00 interest payments "pretty much on time."[26] This, combined with what Workman viewed as CAMI's robust inventory of numismatic coins to sell to the general public, caused him to make his second and third investments in 2006 and 2008.[27] However, Workman testified that at some point after making the third investment he became "uneasy about the whole situation" because his interest payments became delayed and the checks began bouncing, prompting Workman by 2010 to begin requesting that CAMI cashout or refund his investment of principal.[28] In response, the Debtor allegedly gave "a lot of excuses, and reasons and so forth why he could not pay off those subscriptions."[29] Ultimately Workman was issued a $250,000.00 check to pay off his initial investment from 2005, but that check also

---

[23] Defendant's Exhibit 5, Offering Circular at p. 1.
[24] Trial Transcript, 86:3 to 86:13.
[25] Defendant's Exhibit 5, Offering Circular at p. 1, 7, 10.
[26] Trial Transcript, 89:15 to 90:1.
[27] *Id.*
[28] Trial Transcript, 78:15 to 78:25; 90:8 to 90:13.
[29] Trial Transcript, 86:17 to 86:20.

5

bounced.[30] Workman testified that in 2012, the Debtor informed him that "he was not going to be able to pay the interest payments for an unknown amount of time, and ... there was a mention of a working line of credit; not with who but he made that mention. He would be able to 'make me whole again.' ... And that the interest and the principals would all be brought present."[31]

Sometime in 2012, Workman retained counsel to investigate his issues with CAMI and the Debtor,[32] and in December of that year he filed a Complaint against CAMI in the Superior Court of the State of Delaware (the "Delaware Superior Court Action").[33] In the Delaware Superior Court Action, Workman alleged claims for breach of contract and a "debt action" against CAMI based on its failure to repay his investments.[34] Workman testified that only CAMI was named as a defendant in the Delaware Superior Court Action because CAMI was "the sole caretaker of my subscriptions" as the issuer of those investments.[35] On February 25, 2013, Workman obtained a judgment against CAMI in the Delaware Superior Court Action in the amount of $750,000.00 plus statutory interest (the "Delaware Superior Court Judgment").[36]

Workman testified that after obtaining the Delaware Superior Court Judgment, his counsel began investigating whether "there was a way to pierce the corporate veil," and during the course of that investigation Workman became aware of litigation (the "IDB Litigation") initiated against CAMI and FSD by Israel Discount Bank of New York ("IDB") in the Court of

---

[30] Trial Transcript, 86:19 to 86:22; 90:13 to 90:15.
[31] Trial Transcript, 90:16 to 90:24.
[32] Trial Transcript, 91:15 to 90:23.
[33] Trial Transcript, 91:24 to 93:4.
[34] Defendant's Exhibit 3.
[35] Trial Transcript, 92:5 to 92:10.
[36] Joint Pre-Trial Statement, at ¶5.

Chancery of the State of Delaware (the "Delaware Court of Chancery").[37] Workman testified that, based on his review of the Delaware Court of Chancery's May 29, 2013 Memorandum Opinion finding in favor of IDB,[38] he learned that "the assets of CAMI had been funneled over to use as collateral for the Israel Bank loan/credit line."[39] This revelation caused Workman to conclude that, contrary to his understanding that his investments in CAMI through the Secured Participations would always be secured by a first priority lien in the numismatic coins inventory CAMI used the investments to purchase, "it became evident that Mr. Higgins was going to use the money for other purposes such as using the coins as collateral for his loan/credit line with Israel Bank."[40]

On May 6, 2016, Workman filed a Complaint in the Delaware Court of Chancery (the "Delaware Veil Piercing Litigation") against the Debtor, CAMI, FSD, and another of the Debtor's entities, Certified Assets Management International, LLC, seeking, *inter alia*, to pierce the corporate veil of CAMI and obtain a judgment against the Debtor in the amount of the Delaware Superior Court Judgment and for fraudulent transfers.[41] Less than two weeks later, on May 18, 2016, the Debtor filed his bankruptcy petition, staying the Delaware Veil Piercing Litigation.

IV.    **DISCUSSION**

   A.    **Should the Court Pierce the Corporate Veil of CAMI?**

Workman has asserted a claim against the Debtor for $750,000.00, based on the investments Workman made in CAMI and the Delaware Superior Court Judgment he obtained

---

[37] Trial Transcript, 92:11 to 93:16.
[38] Plaintiff's Exhibit 5.
[39] Trial Transcript, 94:12 to 94:23.
[40] Trial Transcript, 47:1 to 47:18. See also 49:25 to 50:24; 51:23 to 52:5.
[41] Complaint, at ¶8.

against CAMI. Before the Debtor filed for bankruptcy protection, Workman sought a finding from the Delaware Court of Chancery that CAMI's veil should be pierced and the Debtor should be held liable for CAMI's debt to Workman. The Delaware Veil Piercing Litigation was stayed by the Debtor's bankruptcy petition and there has been no finding as of yet that the Debtor is responsible for CAMI's debts. Therefore in order for Workman to hold a claim against the Debtor, and in turn whether any such claim is or is not discharged, depends on this Court finding that CAMI's veil should be pierced such that Workman can look to the Debtor for recovery of the Delaware Superior Court Judgment and his investments in CAMI.

The Court must first determine what law applies. In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state. *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998). In Pennsylvania, the forum state here, questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation. *Forcine Concrete & Constr. Co. v. Manning Equip. Sales & Serv.*, 426 B.R. 520, 525 (E.D. Pa. 2010) (*citing* 15 Pa. Cons. Stat. §4145(a)). As CAMI is a Delaware corporation, the internal affairs doctrine dictates that Delaware law applies to determine whether CAMI's veil should be pierced to hold the Debtor liable for its debts. *See, e.g., Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, 2007 U.S. Dist. LEXIS 51081, at *14-16 (S.D.N.Y. July 17, 2007) (applying Delaware law to determine veil-piercing claim against Delaware limited liability company).

1. **Standard for Veil Piercing Under Delaware Law**

Piercing the corporate veil under Delaware law is a difficult task. *Midland Interiors, Inc. v. Burleigh*, 2006 Del. Ch. LEXIS 220, at *9 (Del. Ch. Dec. 19, 2006) (*citing Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 Del. Ch. LEXIS 114, at *4 (Del. Ch. Sept. 19, 1989)). Delaware

8

law requires that a party seeking to do so must prove it is warranted with evidence "at least somewhat greater than merely a preponderance of the evidence standard." *Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 237 (Bankr. D. Del. Mar. 7, 2003).

Absent compelling cause, a court will not disregard the corporate form or otherwise disturb the legal attributes, such as limited liability, of a Delaware corporation. *Midland*, 2006 Del. Ch. LEXIS 220, at *9. A Delaware court will only pierce the corporate veil in order to prevent fraud, illegality, or injustice, or the adverse effects thereof. *Foxmeyer*, 290 B.R. at 236 (Bankr. D. Del. Mar. 7, 2003) (*quoting U.S. v. Del Campo Baking Mfg. Co.*, 345 F.Supp. 1371, 1378 (D. Del. 1972)). Furthermore, the fraud or similar injustice that must be demonstrated in order to pierce a corporate veil under Delaware law must be found in the defendant's use of the corporate form; *i.e.*, the injustice must be more than the breach of contract or other wrong alleged. *Foxmeyer*, 290 B.R. at 236 (*citing Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996)); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010) (veil-piercing requires proof that some fraud or injustice would be perpetrated through misuse of the corporate form). Delaware courts have only been persuaded to pierce the corporate veil after substantial consideration of the shareholder-owner's disregard of the separate corporate fiction and the degree of injustice impressed on the litigants by recognition of the corporate form. *Midland*, 2006 Del. Ch. LEXIS 220, at *9-10. Therefore the evaluation of corporate formalities must be performed in conjunction with consideration of any fraudulent action committed under the guise of the corporate form. *Id.* at *10-11.

Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking; (2) whether

the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder. *MicroStrategy,* 2010 WL 5550455, at *11. A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them combined with the presence of some overall injustice or unfairness. *Id.*

### 2.  Collateral Estoppel Is Inapplicable to Workman's Veil Piercing Theory

Before turning to whether Workman met his evidentiary burden at trial to establish that CAMI's veil should be pierced, the Court must first address Workman's contention that the findings of the Delaware Court of Chancery in its Memorandum Opinion in the IDB Litigation serve as collateral estoppel with respect to some or all of the requirements that need to be met to pierce CAMI's corporate veil.[42]

Collateral estoppel prohibits the relitigation of issues that have been adjudicated in a prior lawsuit and applies in discharge proceedings in bankruptcy court. *See, e.g., Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 214 (3d Cir. 1997) (*citing Grogan v. Garner*, 498 U.S. 279, 284-85 n.11 (1991); *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995)). For a party to be estopped from relitigating an issue, the following elements must be present: (1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment. *Id.* (*citing In re Ross*, 602 F.2d 604, 608 (3d Cir. 1979) and Restatement (Second) Judgments §27 (1982)).

---

[42] Plaintiff's Exhibit 5.

At trial, Workman contended that the Delaware Court of Chancery made a finding in the IDB Litigation that "there is overlap" between the Debtor, FSD, and CAMI.[43] Workman pointed to Vice Chancellor Parson's statement in the Memorandum Opinion that the Debtor "is an unscrupulous businessman who used his businesses, First State Depository and CAMI, to move around assets in the equivalent of a three-card monte scheme to serve defendants and without regard to Israel Discount Bank's rights."[44] In his Post-Trial Brief, Workman did not elaborate on this argument. Instead, he argued the Memorandum Opinion established that the Debtor and CAMI colluded with its lender to use straw borrowers to obtain financing in excess of lending caps that IDB imposed, and that the Delaware Court of Chancery "was highly critical of [the Debtor] for having engaged in this collusive conduct as well as his actions in barring IDB from conducting an audit of coins and bullion that were supposed to be stored at [FSD], an entity that was solely owned and managed by [the Debtor]."[45]

The Debtor argued at trial that the application of collateral estoppel is not appropriate because the Debtor was not a party to the IDB Litigation and the Delaware Court of Chancery did not determine that he was personally liable for the debts of CAMI or FSD.[46] The Debtor repeats this argument in his Post-Trial Brief.[47] In response Workman argued at trial and in his Post-Trial Brief that the principle of collateral estoppel can bar relitigation both by parties in the prior action and those in privity to the parties, and that the Debtor stands in privity with CAMI and FSD.[48]

---

[43] Trial Transcript, 33:1 to 33:6.
[44] Trial Transcript, 36:11 to 37:23; Plaintiff's Exhibit 5 at p.3 n.2.
[45] Plaintiff's Post-Trial Brief, at p. 7-8.
[46] Trial Transcript, 32:5 to 32:11; 33:9 to 33:18.
[47] Defendant's Post-Trial Brief, at p. 48-49.
[48] Trial Transcript, 34:18 to 34:25.

The Court finds Workman has not established that the application of collateral estoppel is warranted to bar relitigation of any issue in this action. It is not clear to the Court what facts or issues Workman is even arguing are subject to collateral estoppel and how those facts or issues establish any element of Workman's veil piercing claim. While Workman referenced collateral estoppel both at trial and in his Post-Trial Brief, he did so fleetingly and without the precision required for this Court to find that the doctrine applies.

At trial it was the Court's understanding that Workman intended to argue that the Memorandum Opinion barred relitigation of some aspect of his veil piercing theory in the present action.[49] At trial, however, Workman cited only to a lone observation of the Vice Chancellor, contained in a footnote of the Memorandum Opinion regarding the state of CAMI's and FSD's records, that the Debtor was "an unscrupulous businessman who used his businesses, FSD and CAMI, to move around assets in the equivalent of a three-card monte scheme to serve Defendants' ends and without regard to IDB's rights."[50] Surprisingly, in his Post-Trial Brief Workman did not again mention this observation, let alone explain its importance to his veil-piercing argument. Workman did not explain, for example, whether and why the cited portion of the Memorandum Opinion constitutes a finding to which the Debtor is bound that CAMI's corporate formalities were not observed, that the Debtor siphoned CAMI's funds, or that CAMI simply functioned as a façade for the Debtor.

Nor has the Debtor established any of the elements of collateral estoppel are met by any particular finding of the Delaware Court of Chancery. He has made no argument that the Vice Chancellor made a finding in the IDB Litigation that is the same that must be proven here, that

---

[49] Trial Transcript, 37:18 to 37:23.
[50] Plaintiff's Exhibit 5, at p.3 n.2.

the parties in the IDB Litigation actually litigated that issue, or that the finding was essential to the judgment in the IDB Litigation. Instead, Workman focused both at trial and in his Post-Trial Brief on the privity between the Debtor and CAMI, which, even if true, satisfies just one of the several requirements for collateral estoppel to apply. Moreover, the Court finds Workman's argument in his Post-Trial Brief that the Memorandum Decision established the Debtor's and CAMI's fraudulent collusion with their lender to be suggestive (at best) of the "overlap" Workman argues exists between the Debtor and CAMI which would warrant piercing CAMI's corporate veil. Workman has pointed this Court to no findings by the Delaware Court of Chancery that the Debtor used the corporate form of CAMI to perpetrate an injustice or fraud, that corporate formalities were not observed, that CAMI served only as a façade for the Debtor, or anything else that serves to collaterally estop the Debtor in this litigation.

In sum, Workman has not met his burden of establishing that all elements of collateral estoppel are met with respect to any particular finding in the IDB Litigation that would bind the Debtor to that finding for purposes of whether CAMI's corporate veil should be pierced.

### 3. Workman Failed to Establish that CAMI's Veil Should be Pierced

As discussed above, in order to establish that CAMI's corporate veil should be pierced to render the Debtor liable for CAMI's debt to Workman, Workman was required to prove that the Debtor abused the corporate form to commit fraud or some similar injustice, and that it was his misuse of the corporate form, as opposed to a breach of contract or some other basis for liability, that was the genesis of the wrong inflicted on Workman. The Court finds that Workman has failed to do so.

First, the Debtor provided uncontroverted testimony that CAMI observed corporate formalities as a Delaware corporation. The Debtor testified that CAMI was formed in August of

2001 with two shareholders: the Debtor and Donald Ketterling.[51] A third shareholder, Carl Herzinger, was subsequently added.[52] At some point between 2008 and 2010, the Debtor became CAMI's sole shareholder.[53] At the time of its formation, CAMI had three officers: the Debtor served as president, Donald Ketterling served as vice president, and Carl Herzinger served as secretary and treasurer.[54] At the time of trial the Debtor was CAMI's sole shareholder, officer and director.[55] The Debtor testified that between the time of its formation and the time it ceased operations in March of 2012, CAMI held annual shareholder meetings and board meetings for which minutes were kept.[56] At trial Workman testified that he did not believe CAMI was a "legitimate corporation" because the corporation did not keep board minutes, but when pressed on his basis for that assertion Workman could only speculate: "I've never been offered to have them shown to me. I've never seen them. I have no idea if there's any existence of any real corporate minutes or anything related to that."[57] This speculation is insufficient to establish that CAMI failed keep corporate minutes as required of a Delaware corporation. Rather, in the face of contrary testimony from the Debtor, Workman did not offer any evidence that CAMI failed to observe corporate formalities in its formation, governance, structure or record-keeping.

Second, the testimony and other evidence at trial supports the conclusion that CAMI, whatever the flaws in its business model, was not simply a sham or a façade for the Debtor. In

---

[51] *Id.*

[52] Trial Transcript, 112:1 to 112:21.

[53] Trial Transcript, 111:12 to 111:18.

[54] Trial Transcript, 112:22: 113:1.

[55] Trial Transcript, 113:2 to 113:11.

[56] Trial Transcript, 113:21 to 114:4.

[57] Trial Transcript, 77:18 to 77:23.

addition to observing the corporate formalities discussed above, Workman himself testified as to CAMI's business model and inventory. Workman testified that CAMI bought and sold rare coins for a profit, and attended every Long Beach coin show, held three times a year, since 2004.[58] The Debtor testified regarding CAMI's employees, its business model, and the financing CAMI sought and obtained as the business model grew.[59] Workman also testified as to the high quality of CAMI's coin and bullion inventory, stating that it was "very impressive at first in 2005, 2006, 2007. There would be several million dollars' worth of inventory there and rare coins."[60] Workman further testified that even after making his initial $250,000.00 investment in CAMI in 2006, he continually monitored CAMI's inventory and felt that there was good inventory to sell and CAMI "appeared to be doing a reasonably good business which inspired me to buy the second subscription there in 2006 … and subsequently the last subscription in 2008."[61] Based on the testimony at trial the Court concludes that CAMI, rather than serving as a shell for the Debtor to perpetrate a fraud, bought and sold inventory consistent with its business model.[62] It was not until "2014 or so" that Workman noticed that CAMI's inventory had deteriorated at the Long Beach coin show.[63] Nonetheless, Workman confirmed that between March 1, 2006 and March 16, 2012, he received interest payments from CAMI totaling at least $367,500.00.[64] The Court finds credible the Debtor's testimony that market conditions

---

[58] Trial Transcript, 84:1 to 85:3.
[59] Trial Transcript, 132:9 to 133:24.
[60] Trial Transcript, 88:10 to 88:13.
[61] Trial Transcript, 89:15 to 90:1.
[62] Trial Transcript, 158:13 to 159:4.
[63] Trial Transcript, 91:6 to 91:14.
[64] Trial Transcript, 104:3 to 104:13.

contributed to CAMI's downfall, but at the time of each of Workman's investments CAMI had the resources and the intention to repay those investments upon their original maturity dates.[65]

The sum of the testimony and evidence at trial leads the Court to the conclusion that while CAMI ultimately was a failed enterprise fueled by problematic business decisions, it was a legitimate corporate entity, not a sham or a façade for the Debtor. The evidence instead suggests that Workman made a series of investments in CAMI, received some return on those investments, but did not come close to recovering what he was entitled to under the Subscription Agreements with CAMI. Upon the slowing of his interest payments and learning of CAMI's relationship with and misfeasance with respect to IDB, Workman surmised that CAMI must have been a farce from the start, and sought to turn his contractual claims against that entity into claims against the Debtor.[66] Reviewing the totality of the evidence, Workman has not established that CAMI was presented as or used as a corporation for no purpose other than to perpetrate a fraud or injustice against him that warrants piercing its veil. Workman clearly is the unfortunate victim of a failed investment with a company the Debtor owned and managed, but because he cannot establish that piercing the entity's veil is proper under Delaware law, any claim he might have against CAMI cannot be converted to a claim against the Debtor.

### B. Workman Does Not Have a Claim Against the Debtor

Workman holds the Delaware Superior Court Judgment against CAMI, not the Debtor. Likewise, any claim he has in connection with his investment in CAMI is against CAMI, not the Debtor. Because Workman has failed to establish that CAMI's corporate veil should be pierced

---

[65] Trial Transcript, 114:5 to 114:9; 165:3 to 166:8; 168:4 to 168:25.
[66] Trial Transcript, 57:8 to 57:21; 94:2 to 94:24; 100:14 to 102:12; 109:2 to 110:8.

to permit his claims against CAMI to be asserted against the Debtor, he does not have a claim against the Debtor nor is he entitled to a determination of nondischargeability.[67]

## V. CONCLUSION

For the reasons discussed above, this Court will (i) enter judgment in favor of the Debtor in the Nondischargeability Action, and (ii) sustain the Debtor's Claim Objection. An Order consistent with this Memorandum will be entered.

Dated: August 20, 2019

*[signature]*

MAGDELINE D. COLEMAN
CHIEF UNITED STATES BANKRUPTCY JUDGE

Robert J. Lohr, II, Esquire
Lohr and Associates, Ltd.
1246 West Chester Pike, Suite 312
West Chester, PA 19382

Michael G. Busenkell, Esquire
Gellert Scali Busenkell & Brown LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801

William C. Miller, Esquire
Chapter 13 Trustee
P.O. Box 1229
Philadelphia, PA 19105

United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106-2912

---

[67] *See, e.g., Skinner v. Skinner (In re Skinner)*, 519 B.R. 613, 622 (Bankr. E.D. Pa. 2014), *aff'd*, 532 B.R. 599 (E.D. Pa. 2015), *aff'd* 636 Fed. Appx. 868 (3d Cir. 2016) (finding plaintiff lacked standing to assert nondischargeability claim where he failed to establish a right to payment that would render him a creditor); *Tropicana Casino & Resort v. August (In re August)*, 448 B.R. 331, 346-47 (Bankr. E.D. Pa. 2010) (citing supporting caselaw in finding that the plaintiff first had to establish a valid claim against the debtor in order to prevail under §§523(a)(2) or 523(a)(6)).